## OBERMEIER v. KASS.

### (Circuit Court of Appeals, Second Circuit.  December 15, 1914.)

### No. 115.

BANKRUPTCY ☞164—PREFERENCES—PAYMENTS.

    Defendant was a private banker and a creditor of a bankrupt. His son was the manager of the banking business, and also president of a realty company; but both testified positively that *defendant had no connection with the realty company*. The bankrupt, who was then insolvent to defendant's knowledge, executed a bond and mortgage to the realty company, receiving a check for the amount thereof on defendant's bank. This check he gave to K. in exchange for K.'s check on a different bank, and then gave K.'s check to a broker in exchange for the broker's check on his own bank. He delivered the broker's check to defendant in payment of the indebtedness. All of the checks were paid. *Held*, that the contention that there was no preferential transfer, because defendant received no money, except what he had just paid out, was unsound, as he received the amount of the broker's check, while the amount paid out by him was charged to the account of the realty company and reduced his indebtedness to it.

    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267; Dec. Dig. ☞164.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, dismissing the bill of complaint in a suit brought by the trustee to set aside as preferential a transfer or payment amounting to $3,500, made by the bankrupt to defendant on or about January 16, 1913. The facts will be found in this opinion.

Ralph Wolf, of New York City, for appellant.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. Emil Reibstein, the bankrupt, was engaged in some business in the Southern district of New York; his son being in general charge of the office, managing his father's affairs. An involuntary petition in bankruptcy was duly filed against him on March 25, 1913. The defendant Abraham L. Kass conducts a private banking business; his son, David Kass, being manager of the business. David Kass is also a stockholder and the president of a corporation known as the Eastern & Southern Realty Company, hereinafter called the Realty Company. With this corporation Abraham L. Kass had no connection whatever. He was not an officer or stockholder, and had no pecuniary interest, in it.

For some time prior to January 15, 1913, the bankrupt had occasionally discounted notes made by him and indorsed by others at defendant's bank. On and prior to that day defendant was an unsecured creditor of the bankrupt in the sum of $3,500, represented by four such notes. One of these, for $1,000, was past due about a month, had been protested, and the bankrupt had been repeatedly requested to pay it. The other three notes would fall due January 30th, February 13th, and March 10th, respectively. The discounting of Reibstein's notes with Kass had usually been effected by one Wladover, a broker. The Realty Company kept a bank account, subject to check, with defendant. Its credit balance on January 16, 1913, was in excess of $6,000.

It was stipulated on the trial that on the 14th day of January bankrupt was insolvent. The question whether or not on that day, or rather on January 16th, defendant knew or had reasonable cause to believe the bankrupt to be insolvent, was an issue in the case, about which much testimony was taken. The District Judge, who saw all the witnesses, reached the conclusion that at the time of the occurrences next hereinafter referred to defendant had reasonable cause to believe that Reibstein was insolvent. From an examination of the testimony we have no hesitation in reaching the same conclusion. What took place on January 15th, and immediately subsequent, may be thus condensed:

Reibstein executed a bond for $4,000, and he and his wife executed a mortgage of real estate on the south side of Madison street, New York City, to the Realty Company. This bond and mortgage and notes of Reibstein to the amount of $4,000, indorsed by others, were turned over by him to the Realty Company, which in return delivered to him its check for $4,000 on defendant's bank. At the moment of transfer Mrs. Reibstein had not executed the mortgage, so the check was at once handed by bankrupt to Wladover, who also took the mortgage to obtain her signature. After she had signed the mortgage, and some lienors on the real estate had signed a subordination agreement, bond, mortgage, and notes were turned over to the Realty Company, and Reibstein and Wladover went to the saloon of a man named Kuflik. Kuflik sent the check of the Realty Com-

pany over to Kass' bank and had it certified. It had been indorsed by Reibstein. When it was certified, Kuflik kept it, and gave in exchange for it to Wladover $500 in cash and a check of A. & S. Kuflik on the Security Bank of New York for $3,500. Wladover says he was to have $500 for his services. He deposited the Kuflik check in his own bank, and drew his check on said bank for $3,500 to the order of Abraham L. Kass. This check he delivered to defendant on January 16th, and in exchange received from Kass the four notes of the bankrupt first above referred to, which notes were destroyed. In due course these three checks—the Realty Company check, the Kuflik check, and the Wladover check—were paid by the several banks on which they were drawn.

The District Judge dismissed the bill, on the theory that there had been no real transfer of cash by the bankrupt to defendant, and that, if the relief prayed for was granted, defendant would "be obliged to pay out $3,500 which he never really received, except as it had just come out of his own pocket." We are unable to concur in this conclusion. It seems to overlook the circumstance that the Realty Company had a substantial balance in Kass' bank. Defendant did pay $4,000 to Kuflik's bank, which presented the Realty Company check for that amount. But we do not see how it can be said that this $4,000 "came out of his (Kass') own pocket." It came out of the balance of $6,000 which the Realty Company had with defendant. After it was paid he owed that company $2,000, instead of $6,000. He was not out of pocket one penny by the payment of this check; he parted with nothing. On the other hand, he received Wladover's check, which was the same as cash, for Wladover's bank paid it on presentation. In return for this $3,500, defendant parted only with the four notes of Reibstein which he held. Instead of being an unsecured creditor of the bankrupt in the amount of $3,500, he was no longer a creditor at all, but he had in place of the notes $3,500. Moreover, this $3,500 came to Wladover from the bankrupt, being part of the proceeds of the check he received from the Realty Company in exchange for bond, notes, and a mortgage of his real estate executed by himself and his wife. Of course, if Kass and the Realty Company were in fact the same concern, masquerading under two different names, the situation would be different. But since Kass, the bankrupt, and his son, the president of the Realty Company, both testified most positively and repeatedly that defendant had no interest at all in the company, we do not see how it can be held that he and the company were one.

Moreover, the first paragraph of the answer admits that "on or about January 16, 1913, the bankrupt transferred and delivered to the defendant in payment of an indebtedness the sum of $3,500." The only issues joined by the answer are as to insolvency and defendant's knowledge or reasonable cause to believe that such insolvency existed. When the District Court found for the complainant on those issues, he was entitled to a decree.

Decree reversed, with costs.